## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER JOSEPH WORKMAN, | ) | CASE NO. 3:23-CV-01167-JRK |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| v. | ) | JAMES R. KNEPP, II |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | U.S. MAGISTRATE JUDGE |
| SECURITY, | ) | JENNIFER DOWDELL ARMSTRONG |
| | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

### I.   INTRODUCTION

Plaintiff, Christopher Joseph Workman ("Mr. Workman"), seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for Supplemental Security Income ("SSI"). (ECF No. 1.) This matter is before me pursuant to 42 U.S.C. §§ 405(g) and Local Rule 72.2(b). (*See* ECF non-document entry dated June 12, 2023). For the reasons set for the below, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

### II.   PROCEDURAL HISTORY

On February 16, 2018, Mr. Workman filed his application for SSI, alleging a disability onset date of October 1, 2017. (Tr. 192-201.)[1] Mr. Workman's application related to his autism spectrum disorder, depression, and anxiety. (Tr. 200.)

The Social Security Administration ("SSA") denied Mr. Workman's application initially and upon reconsideration. (Tr. 90-92, 99-103.) Mr. Workman requested a hearing before an

---

[1] The administrative transcript ("Tr.") appears at ECF No. 5 on CM/ECF. All page number references to the administrative transcript herein are to the Bates numbers on the bottom right-hand corner. All other record citations are to the CM/ECF-generated page numbers.

administrative law judge ("ALJ"). (*See* Tr. 12, 105.) The ALJ held a telephone hearing on August 12, 2020, at which Mr. Workman was represented by counsel. (Tr. 24-61.) Mr. Workman testified, as did an independent vocational expert ("VE"). (*Id.*) On August 28, 2020, the ALJ issued a written decision, finding that Mr. Workman was not disabled. (Tr. 476-90.) The ALJ's decision became final on June 4, 2021, when the Appeals Council declined further review. (Tr. 491-96.) Mr. Workman requested judicial review.

Upon joint stipulation from the parties, the U.S. District Court for the Northern District of Ohio remanded Mr. Workman's case for further administrative proceedings on January 13, 2022. (Tr. 497-501.) An ALJ held another telephone hearing on February 22, 2023, during which Mr. Workman and a VE testified. (Tr. 448-75.) On March 13, 2023, the ALJ issued a written decision again finding that Mr. Workman was not disabled, which became the final decision of the Commissioner (Tr. 427-41); *see* 20 C.F.R. §§ 416.1481, 422.210(a). On June 12, 2023, Mr. Workman filed a Complaint in the U.S. District Court for the Northern District of Ohio, challenging the Commissioner's final decision. (ECF No. 1.) Mr. Workman asserts the following assignments of error:

> (1) The ALJ failed to even consider Dr. Strobel's findings as a medical opinion as defined by Social Security, and therefore erred by not properly evaluating his opinions in accordance with 20 C.F.R. § 416.920c.

> (2) The ALJ erroneously omitted the need for superficial interaction from the residual functional capacity significantly prejudicing Mr. Workman's disability claim.

(ECF No. 6, PageID#847.)

III.    **BACKGROUND**

A.    <u>**Personal, Educational, and Vocational Experience**</u>

Mr. Workman was born in 1990, and he was 27 years old when he filed for SSI. (Tr. 192, 455.) He has a high school education and no past relevant work. (Tr. 455-56.) He lives with his parents and has a driver's license. (Tr. 455.)

B.    <u>**Relevant Non-Medical/Medical Opinion Evidence**</u>

1.    *State Agency Opinions*

Kristen Haskins, Psy.D., reviewed Mr. Workman's medical record at the initial level of consideration in June 2018. (Tr. 69-71.) Dr. Haskins opined that Mr. Workman was capable of completing short-cycle tasks that do not have strict production demands or require a fast pace demand where Mr. Workman could work away from others. (Tr. 70.) Dr. Haskins also opined that Mr. Workman was capable of occasional, superficial interaction with co-workers, supervisors, and the general public. (*Id.*) Dr. Haskins further opined that Mr. Workman can adapt to a work setting in which duties are routine and predictable. (Tr. 71.) Dr. Haskins also stated that changes should be well-explained and introduced slowly. (*Id.*) Finally, Dr. Haskins opined that Mr. Workman's ability to handles stress and pressure in the workplace is reduced but adequate to handle the stresses of routine work that does not involve timed tasks or rate quotas. (*Id.*) Todd Finnerty, Psy.D., reviewed the record at the reconsideration level in September 2018 and agreed with Dr. Haskins' findings. (Tr. 84-86.)

2.    *Glen Strobel, Ph.D.*

Mr. Workman underwent a psychological evaluation with Dr. Strobel in January and February 2018. (Tr. 281.) Dr. Strobel diagnosed Mr. Workman with autism spectrum disorder, major depressive disorder, and social anxiety disorder. (Tr. 284.) Dr. Strobel wrote that Mr.

Workman's responses to the items on the Short Item Screening Test indicate that he has a "great deal of difficulty working with people in groups"; has "a lot of trouble figuring out what other people expect of him"' has a "hard time knowing how to act in social situation[s]"; "finds it a mystery to know how to chat with people and make friends"; tends to focus on details of situations rather than "recognizing the big picture"; "tends to take things too literally" and misses what people are trying to say to him; and gets "very upset when things change from the way he likes to do things." (*Id.*) Based on the results of the evaluation, Dr. Strobel provided several recommendations, including that Mr. Workman (1) "should continue in outpatient therapy" to work on decreasing his depression, improving his social skills, and setting goals for becoming more independent in the future; (2) "should complete his associates degree as that may improve his employability;" (3) "may need a support system in place to help him be able to find and keep a job;" (4) "should continue with medication to help to manage his depression and anxiety;" (5) "will need to push himself to accomplish independent living skills;" and (6) "will also need to practice skills that improve his social skills, including…observing his body language and its effect on other people, improving his ability to make socially appropriate eye contact, and speaking up in social situations." (Tr. 284-85.)

### 3. *Michael Wuebker, Ph.D.*

Dr. Wuebker conducted a psychological evaluation of Mr. Workman in September 2018. (Tr. 344.) Dr. Wuebker observed that Mr. Workman was neat; appropriately dressed; cooperative; and able to respond appropriately to questions, although with some difficulty sustaining eye contact. (Tr. 347.) Mr. Workman's thought content was logical and coherent; his affect was flat, but his mood was not depressed; and he showed no symptoms of anxiety. (*Id.*) Mr. Workman demonstrated adequate insight and judgment and appeared to be functioning in the low-average

range of cognition. (Tr. 348.) Dr. Wuebker opined that Mr. Workman could be expected to understand and apply instructions for one-step workplace instructions, but more complex work directions would be difficult. (Tr. 349.) Dr. Wuebker further opined Mr. Workman would have some issues with attention and concentration but would be capable of performing these skills in a work situation in line with his abilities. (*Id.*) Moreover, Dr. Wuebker opined that Mr. Workman would have trouble performing social skills appropriately in a work arena. (Tr. 350.) Finally, Dr. Wuebker opined that Mr. Workman would likely have some difficulties responding appropriately to work setting stressors. (Tr. 348-49.)

### C. Relevant Medical Evidence

At the application filing date in 2018, Mr. Workman was receiving counseling services from Julie Wilcox, LSW, and taking Effexor, prescribed by Charles Kratz, M.D., for treatment of his depression. (*See, e.g.*, Tr. 275-76, 328.)

On January 11, 2018, Dr. Kratz saw Mr. Workman and continued Effexor for Mr. Workman's depression. (Tr. 276.) Additionally, Dr. Kratz noted that Mr. Workman's depression was well-controlled. (*Id.*)

Ms. Wilcox saw Mr. Workman on January 15, 2018, and Mr. Workman reported that he still gets anxious in social situations. (Tr. 328.) He attended a follow-up appointment on January 30, 2018, where Ms. Wilcox found that he was making "some progress." (Tr. 330.) Mr. Workman reported that his mother is overly critical and monitors his behavior constantly, which makes making changes difficult. (*Id.*) He stated that planning ahead, writing down goals, problem-solving barriers to change, and coping with his mother's criticism helps him to be more successful with changes. (*Id.*) Mr. Workman continued to attend follow-up appointments with Ms. Wilcox in 2018. (Tr. 331-42.) At a follow-up appointment on April 30, 2018, Mr. Workman stated that his

mood was good, his depression was decreased, and his stress was lower. (Tr. 342.) On May 21, 2018, Mr. Workman reported that he was looking for employment. (Tr. 358.)

On July 11, 2018, Mr. Workman attended a follow-up appointment with Dr. Kratz. (Tr. 378.) He reported that he was "doing well," and his depression was stable. (*Id.*) He received a refill for Effexor. (Tr. 379.) Mr. Workman established care with Brian Cole, M.D., on May 31, 2019. (Tr. 385.) Upon examination, Dr. Cole observed that Mr. Workman was cooperative and appropriate. (*Id.*) Mr. Workman returned to Dr. Cole on August 30, 2019. (Tr. 397.) Mr. Workman reported that Effexor was controlling his moods and that he needed a refill of his medications. (*Id.*) Upon examination, Dr. Cole observed that Mr. Workman had appropriate mood and affect and cooperative behavior. (*Id.*) Dr. Cole made no changes to Mr. Workman's medications and advised Mr. Workman to follow up in five to six months. (Tr. 398.)

On October 22, 2019, Brad Bundy, D.O., saw Mr. Workman. Mr. Workman reported issues with depression anxiety, poor motivation, and concentration. (Tr. 400.) Mental status examination revealed that Mr. Workman "appear[ed] to have problems" connecting empathetically; his memory was good; and he had good insight and judgment. (Tr. 401.) Additionally, Mr. Workman was described as cooperative, with appropriate affect. (*Id.*) Dr. Bundy increased Mr. Workman's Effexor and recommend that he follow-up in three weeks. (*Id.*)

Mr. Workman followed up with Dr. Bundy on November 27, 2019. (Tr. 403.) Mr. Workman reported mild benefit in his mood and anxiety with the Effexor dosage increase. (*Id.*) Mr. Workman's mental status examination revealed that he had bright and appropriate affect, with no evidence of paranoia or delusional thinking; good memory; and good insight and judgment. (*Id.*) Following the examination, Dr. Bundy increased Mr. Workman's Effexor dosage and recommend that he continue counseling. (Tr. 404.)

Dr. Bundy saw Mr. Workman again on December 9, 2019. (Tr. 408.) Mr. Workman reported that he was "doing well" and his depressive and anxious symptoms responded adequately to the increased Effexor dosage. (*Id.*) Mr. Workman's mental status examination revealed he had a bright and appropriate affect, good memory, and good insight and judgment. (*Id.*)

Mr. Workman saw Dr. Cole regarding his anxiety on January 10, 2020. (Tr. 415.) Dr. Cole noted that his anxiety was well-controlled, with no adverse effects. (*Id.*) Examination revealed a cooperative behavior and an appropriate affect. (*Id.*)

On February 10, 2020, Mr. Workman followed up with Dr. Bundy. (Tr. 417.) He denied psychotic or manic symptoms, and his mental health symptoms were in remission. (*Id.*) Mental status testing revealed good memory, appropriate affect, and good insight and judgment. (*Id.*) Dr. Bundy made no changes to Mr. Workman's medications and recommended that he follow up in three months. (Tr. 418.)

Mr. Workman saw Melinda Williams, LPCC, on July 7, 2020. Ms. Williams noted that Mr. Workman was less anxious and less depressed. (Tr. 824.) He returned for a follow-up appointment with Ms. Williams on August 18, 2020. Mental status exam revealed a logical thought process and positive and open mood. (Tr. 821.) On October 6, 2020, Ms. Williams observed that Mr. Workman had a logical thought process and a mostly positive mood and affect. (Tr. 816.) Ms. Williams observed at an appointment on November 4, 2020 that Mr. Workman was anxious but had a logical thought process. (Tr. 814.)

On January 5, 2021, Mr. Workman had a follow-up appointment with Dr. Bundy. Mr. Workman stated that his mood was stable, but he had some anxiety and panic that would break through. (Tr. 812.) His examination revealed good insight and judgment, and a good memory. (*Id.*) Mr. Workman followed up with Dr. Cole on January 7, 2021, and reported that he was doing well.

(Tr. 717.) Mental status examination revealed that Mr. Workman was cooperative. (*Id.*) At a June 10, 2021, appointment, Mr. Workman saw Dr. Cole for anxiety, and the examination found appropriate affect and appropriate behavior. (Tr. 714.)

Ms. Williams saw Mr. Workman on January 11, 2021. Ms. Williams' examination noted that Mr. Workman had a logical thought process, and his mood was calm and less anxious. (Tr. 809.) Ms. Williams noted on February 10, 2021, that Mr. Workman was anxious and more depressed. (Tr. 806.)

Mr. Workman followed up with Dr. Bundy on February 11, 2021. Dr. Bundy increased Mr. Workman's Effexor dosage. (Tr. 804.) The examination revealed good insight and judgment, good memory, and normal thought process. (*Id.*) Mr. Workman continued to follow up with Dr. Bundy throughout 2021, and the examinations generally showed bright and appropriate affect, good memory, normal thought process, and good insight and judgment. (*See*, *e.g.*, Tr. 780, 784, 796, 801.)

Mr. Workman followed up with Ms. Williams on April 27, 2021. Examination revealed anxious mood but logical thought process. (Tr. 793.) Mr. Workman continued to receive counseling from Ms. Williams in 2021. (Tr. 774, 777, 782, 786-90.)

Dr. Bundy saw Mr. Workman on January 10, 2022, and Mr. Workman reported that his mood was stable and counseling was going well. (Tr. 772.) Examination revealed bright and appropriate affect, normal speech and thought processes, good recent and remote memory, and good insight and judgment. (*Id.*) Dr. Bundy continued Mr. Workman's medications and recommended that he follow up in three months. (*Id.*)

Mr. Workman saw Dr. Cole on June 9, 2022. Mr. Workman stated that his anxiety and depression were "well-managed." (Tr. 707.) Examination revealed Mr. Workman had cooperative

behavior and appropriate mood and affect. (Tr. 708.) Dr. Cole continued Mr. Workman's medications and advised him to follow up in six months. (*Id.*) Mr. Workman followed up with Dr. Cole in December 2022, and his examination revealed cooperative behavior and appropriate affect. (Tr. 701.)

Ms. Williams followed up with Mr. Workman on September 19, 2022. Ms. Williams noted that Mr. Workman was positive, pleasant, and less anxious. (Tr. 740.)

Dr. Bundy saw Mr. Workman on October 24, 2022, and Mr. Workman stated that his mental health symptoms were responding to treatment. (Tr. 735.) Mental status examination found normal thought process and good memory. (*Id.*)

Mr. Workman saw Ms. Williams on December 15, 2022. (Tr. 436.) Examination revealed Mr. Workman had a euthymic mood, was less anxious, and had a logical thought process. (*Id.*) On January 12, 203, Ms. Williams followed up with Mr. Workman, and Mr. Workman stated that he was exercising more and socializing with some gym members. (Tr. 724-25.)

Mr. Workman returned to Dr. Bundy on January 23, 2023. He reported to Dr. Bundy that his mood was stable and that he had been "doing well with his depressive and anxious symptoms responding to treatment." (Tr. 721.)

### D.  <u>Relevant Hearing Testimony</u>

Mr. Workman testified that his autism prevents him from full-time work because too much noise overwhelms and distracts him, and he "kind of shut[s] down." (Tr. 456.) He stated, however, that "if there isn't any like distractions, [he] usually become[s] like hyper focused on what [he's] doing," and could usually do the work required. (Tr. 456-57.) He thought, for example, that he could perform an overnight stocking job. (Tr. 457.) He typically wears noise-cancelling headphones when he goes grocery shopping with his mother. (Tr. 465.)

9

Mr. Workman reported that his hobbies are writing and playing video games. (Tr. 457.) He plays video games with friends online every day for about five hours. (Tr. 458.) He completes chores around the house, such as helping his father get around; vacuuming; mopping; cleaning; doing laundry; and helping his mother with grocery shopping. (Tr. 458.) He will do these tasks if he is asked or independently. (Tr. 459.)

Mr. Workman testified that he has no issues getting along with others. (Tr. 460.) Upon questioning from his counsel, however, he also testified that he takes criticism personally and feels self-defeated, even though he logically knows it is not personal. (Tr. 465.) In response to criticism, he tries to do better, but "often [he] kind of struggle[s] at first." (Tr. 466.) He also testified that when he is overwhelmed he has problems with irritability and temper. (Tr. 464.)

Mr. Workman also testified that he has issues with memory due to his depression and, at times, he needed reminders to take care of chores. (Tr. 460.) He also testified that he can concentrate very well without distractions, but he is unable to concentrate or hold a conversation with a person if there is noise. (*Id.*) He stated that he has issues following directions due to auditory processing issues stemming from his autism. (Tr. 461.) He explained that he has a hard time understanding people if they are "right next to [him]," especially if there is noise around. (*Id.*) He prepares meals following recipes that are selected by his parents. (Tr. 462.) He testified that he is not able to drive locally without the use of navigation assistance. (*Id.*)

## IV.    THE ALJ'S DECISION

In her March 2023 decision, the ALJ first found that Mr. Workman has not engaged in substantial gainful activity since February 16, 2018, the application filing date. (Tr. 429.) The ALJ then determined that Mr. Workman has the following severe impairments: depression; anxiety; and autism spectrum disorder. (Tr. 429-30.) However, the ALJ found that none of these

impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 430-32.) The ALJ also determined that Mr. Workman has the residual functional capacity to perform a full range of work except he is limited to simple tasks in a routine work setting, but not at a production rate pace; occasional changes in the workplace that are well-explained in advance; occasional interaction with supervisors and co-workers; and no interaction related to the essential functions of the job with the general public. (Tr. 433-39.) The ALJ's residual functional capacity determination also found that Mr. Workman can occasionally be exposed to loud noises. (*Id.*)

The ALJ next determined that Mr. Workman has no past relevant work. (Tr. 439.) The ALJ explained that transferability of job skills is not an issue because Mr. Workman does not have past relevant work. (*Id.*) The ALJ determined that considering Mr. Workman's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Mr. Workman could perform, including employment as a cleaner II, bagger, and stuffer. (Tr. 440.) Accordingly, the ALJ concluded that Mr. Workman was not disabled, as defined in the Social Security Act, from the allege disability onset date through March 13, 2023, the date of the ALJ's decision. (Tr. 441.)

## V.    LAW AND ANALYSIS

### A.  <u>**Standard of Review**</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is

supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B. **Standard for Disability**

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id*.

### C. **Analysis**

Mr. Workman raises two assignments of error. First, he asserts the ALJ failed to properly evaluate Dr. Strobel's report. Second, he asserts that the ALJ erred in excluding a superficial interaction limitation opined by the state agency psychologists in the RFC determinations. I recommend that the Court reject both assignments of error because they lack merit.

#### 1. *The ALJ sufficiently assessed Dr. Strobel's report that did not provide specific limitations.*

Mr. Workman asserts that the ALJ failed to properly evaluate Dr. Strobel's report in accordance with the SSA regulations. (ECF No. 6, PageID#852-54.) Specifically, he argues that

13

the ALJ improperly determined that Dr. Strobel's report was not a medical opinion because Dr. Strobel's statements were merely recommendations and not expressed in vocationally relevant terms. (*Id.*) He contends that this is error because the SSA regulations do not require for a medical opinion to be expressed in vocationally relevant terms. (*Id.* at PageID#852 (citing 20 C.F.R. § 416.913)). Further, while Mr. Workman concedes that Dr. Strobel's recommendations were "not provided in the most concrete vocationally relevant terms," he asserts that the ALJ was still required to evaluate them as medical opinions, and that these recommendations were a "fundamental aspect of whether [he] can perform the demands of work." (*Id.* at PageID#853.) This argument is not well-taken.

Dr. Strobel saw Mr. Workman in January and February 2018 for a possible autism diagnosis. (Tr. 281.) Based on his evaluation, Dr. Strobel diagnosed Mr. Workman with autism spectrum disorder. The ALJ also included autism as one of Mr. Workman's severe impairments. (Tr. 284.) Dr. Strobel included in his assessment the following recommendations for Mr. Workman: (1) he "should continue in outpatient therapy" to work on decreasing his depression, improving his social skills, and setting goals for becoming more independent in the future; (2) he "should complete his associates degree as that may improve his employability;" (3) he "may need a support system in place to help him be able to find and keep a job;" (4) he "should continue with medication to help to manage his depression and anxiety;" (5) he "will need to push himself to accomplish independent living skills;" and (6) he "will also need to practice skills that improve his social skills, including…observing his body language and its effect on other people, improving his ability to make socially appropriate eye contact, and speaking up in social situations." (Tr. 284-85.)

The ALJ discussed Dr. Strobel's report but determined that it was "not a medical opinion" because Dr. Strobel "did not opine any limitations in the claimant's ability to perform work-related activities." (Tr. 439.) This was a reasonable determination. As the ALJ explained, the SSA regulations define a medical opinion as "a statement from a medical source about what an individual c[an] still do despite their impairments **and** whether they have one or more impairment-related limitations or restrictions in their ability to perform physical, or mental demands of work activities." 20 C.F.R. § 416.913(a)(2) (emphasis added); *see* Tr. 439. The ALJ also observed that Dr. Strobel's recommendations were "not limitations expressed in vocational terms, but rather they are suggestions for the claimant to treat his impairments." (Tr. 439.)

Mr. Workman's arguments that there was no requirement that Dr. Strobel use vocationally relevant terms and that the ALJ could not "ignore" Dr. Strobel's report are meritless. (ECF No. 7, PageID#852-53.) As demonstrated above, the ALJ did not "ignore" Dr. Strobel's report. Rather, the ALJ discussed it in the decision and ultimately determined that it was not a medical opinion. (Tr. 439.) The Commissioner states: "[W]ithout getting bogged down in the meaning of 'vocationally relevant terms,' *the bottom line is that Dr. Strobel did not opine as to what [Mr. Workman] 'can still do' despite his impairments*." (ECF No. 8, PageID#868 (citing 20 C.F.R. § 416.913(a)(2) (emphasis added)). I agree. Mr. Workman fails to establish *how* these recommendations demonstrate what he "c[an] still do despite [his] impairments." 20 C.F.R. § 416.913(a)(2) (emphasis added). Dr. Strobel's recommendations that Mr. Workman "should continue in outpatient therapy," "should complete his associates degree," "may need a support system in place to help him be able to find and keep a job," and "will also need to practice skills that improve his social skills" fail to provide any specificity as to what job functions Mr. Workman is still able to perform. (Tr. 284-85.)

Mr. Workman lodges a logical bridge challenge to the ALJ's evaluation of Dr. Strobel's opinion by pointing to a different portion of Dr. Strobel's report, in which Dr. Strobel indicated that Mr. Workman's responses to an autism screening test reflected social interaction difficulties, including a "great deal of difficulty working with people in groups." (ECF No. 6, PageID#853-54 (citing Tr. 284.)) Mr. Workman contends that this would have qualified as a medical opinion because it "lists 'impairment-related limitations in [his] ability to perform the physical or mental demands of work activities.'" (*Id.* at PageID#854 (citing 20 C.F.R. § 416.913(a)(2).) Thus, he asserts that the ALJ had an obligation to explain the persuasiveness of Dr. Strobel's report. (*See id.*) But this argument faces the same hurdle as his challenge of the ALJ's evaluation of Dr. Strobel's recommendations. That is because Mr. Workman fails to demonstrate how these are specific statements as to *what Mr. Workman can still do*. *See* 20 C.F.R. § 416.913(a)(2). Significantly, the ALJ did in fact find that Mr. Workman had social interaction limitations (Tr. 431) and thus restricted him to only occasional interaction with supervisors and coworkers (Tr. 433.)

Mr. Workman does not establish any error—or cite to any authority suggesting such—in the ALJ's assessment of Dr. Strobel's report.[2]  Dr. Strobel's report cannot be reasonably be construed as specifically explaining what Mr. Workman can still do. Consequently, I agree that Dr. Strobel's opinion is not a "medical opinion" and that the ALJ did not need to analyze Dr.

---

[2] For the first time in his reply brief (ECF No. 9, PageID#872-73), Mr. Workman also alleges that Dr. Strobel's indications that Mr. Workman had a difficult time motivating himself to complete his goal, would have difficulty sustaining competitive employment, may need either a support system or a job coach, had problems ordering food for himself or going to the store by himself rise this report to the level of a medical opinion. His attempt to expand the scope of his argument is improper. *See Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010) ("We have consistently held, however, that arguments made to us for the first time in a reply brief are waived.") Even if these additional arguments were considered, they lack merit because Mr. Workman again fails to explain how these statements demonstrate *what he can still do*. *See* 20 C.F.R. § 416.913(a)(2). Thus, Mr. Workman does not establish that Dr. Strobel's report was a "medical opinion" for which the ALJ needed to analyze the consistency and supportability factors. *Id.*

Strobel's opinion as if it was. *See Steele v. Comm'r of Soc. Sec. Admin.*, No. 1:21-CV-01226-AMK, 2023 WL 2560817, at *16 (N.D. Ohio Mar. 17, 2023) ("A doctor's comment that symptom control is suboptimal is neither a statement of what Ms. Steele can do despite her impairments nor a statement as to whether she has specific work-related or environmental limitations. Thus, Dr. Bambakidis' comment was not a medical opinion and the ALJ was not required to analyze it as if it was."); *Koschnitzke v. Kijakazi*, No. CIV-20-645-AMG, 2022 WL 634217, at *4 (W.D. Okla. Mar. 3, 2022) (a statement that the claimant should continue to limit her exposure to the environment was not a medical opinion). Accordingly, I recommend that the Court reject Mr. Workman's first assignment of error because it lacks merit.

### 2. *The ALJ appropriately excluded a superficial interaction limitation from Mr. Workman's RFC determination.*

Mr. Workman argues that the ALJ erred in excluding a superficial limitation from the RFC determination. (ECF No. 6, PageID#855-59.) At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ must "articulate how he considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520(e). At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion, but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2). According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520c(c)(1)-(2). An ALJ need not use the exact words

"supportability" or "consistency to consider these factors in its credibility analysis. *See Belnap v. Comm'r of Soc. Sec.*, No. 1:22-CV-00202-CEH, 2022 WL 17669388, at *6 (N.D Ohio Dec. 14, 2022); *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases).

Here, the state agency consultants found that Mr. Workman should be limited to superficial interaction with others. (Tr. 70-71.) The ALJ, however, declined to incorporate this limitation because it "[wa]s not consistent with the evidence in the file." (*See* Tr. 438.) The ALJ rejected this limitation because Mr. Workman was cooperative and displayed logical and coherent thought content at his consultative examination with Dr. Wuebker. (Tr. 438; *see* Tr. 347.)) The ALJ also noted that Dr. Cole—Mr. Workman's regular treatment provider—routinely observed that Mr. Workman had a normal mood and affect, with cooperative behavior. (Tr. 438; *see* Tr. 385, 397, 717.) Thus, the ALJ, addressing the consistency factor, concluded that Mr. Workman's ability to interact with others "is less severe than opined by the State agency consultants." (Tr. 438.)

Mr. Workman disagrees with the assessment of the consistency factor, and he contends that the ALJ's explanation is insufficient. (*See* ECF No. 6, PageID#855-59.) He argues that the ALJ's cited findings were "unrelated to social interaction." (*Id.* at PageID#856-57.) I disagree. The ALJ's cited findings where Mr. Workman repeatedly presented as cooperative with appropriate mood and affect and logical and coherent thought processes appear to be relevant to Mr. Workman's ability to interact appropriately around others. For example, the Paragraph B and C criteria for mental impairment listings notes examples relevant to the ability to interact with others, including "cooperating with others" and "keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00E(2). And Mr. Workman presents no authority establishing that a claimant routinely

presenting to his treatment providers with cooperative behavior and appropriate affect are findings irrelevant to one's ability to interact with others. (*See* ECF No. 6, PageID#856-57.) Thus, Mr. Workman does not establish that the ALJ's cited findings were "random medical findings." (*Id.* at PageID#857.) Mr. Workman's disagreement with the evidence the ALJ weighed to reach the RFC determination does not mean that this determination was unreasonable. The substantial evidence standard is met where, as here, a reasonable mind might accept the relevant evidence as adequate to support a conclusion. *See Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). Thus, the ALJ's consistency factor analysis was not error.

Mr. Workman also contends that the ALJ failed to discuss the supportability factor in assessing the state agency opinions. (ECF No. 6, PageID#857-59.) He then points to the state agency findings of moderate limitations in his ability to interact with others, as well as portions of Dr. Strobel's report, as findings that would support significant limitations in his ability to interact with others. (*Id.* at PageID#858-59.)

While the ALJ did not use language to explicitly flag that she was discussing the supportability factor, the ALJ did not need to discuss supportability in a specific area of her decision in order to properly address the issue. *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 455 (6th Cir. 2016) ("reversal was not warranted [where] the ALJ's conclusion was sufficiently supported by factual findings elsewhere in the decision that need not be repeated").  Yet it must still be "clear which evidence [the ALJ] was referring to." *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474 (6th Cir. 2016). Because the state agency consultants did not have their own treatment records by which to judge their opinions, the ALJ must look to the objective medical evidence. *See* 20 C.F.R. § 404.1520c(c)(1). Reading this decision as a whole and with common sense, I find that the ALJ's discussion of the objective medical evidence adequately discussed the

supportability of the opinion and provided a logical bridge for this Court to follow. *Bruno v. Comm'r of Soc. Sec.*, No. 1:20-CV-2633, 2021 WL 6494779, at *8 (N.D. Ohio Dec. 3, 2021) (finding supportability factor for opinions adequately articulated where the ALJ's discussion of the objective medical evidence "implicitly showed" opined limitation was not supported), *report and recommendation adopted sub nom. Bruno v. Comm'r of Soc. Sec. Admin.*, 2022 WL 125289 (N.D. Ohio Jan. 13, 2022); (noting that the court "read[s] the ALJ's decision as a whole and with common sense"); *see Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001) ("Judicial review of the [Commissioner's] findings must be based on the record as a whole.").

Specifically, the ALJ discussed the findings addressing Mr. Workman's social interaction limitations. For example, in assessing the degree of Mr. Workman's ability to interact with others as moderate, the ALJ discussed findings where treatment providers routinely observed Mr. Workman to have cooperative behavior with appropriate mood and affect despite some difficulty some difficulty maintaining eye contact. (Tr. 431; *see, e.g.*, Tr. 347, 385, 397, 717.) Later in the decision, the ALJ then recounted treatment records over the course of three pages where Mr. Workman demonstrated appropriate affect and behavior and logical thought process and content with his treatment providers upon examination. (Tr. 434-36; *see, e.g.*, Tr. 401, 408, 415, 708, 715.) The ALJ again discussed records related to Mr. Workman's social interaction limitations in the SSR 16-3p analysis and pointed to numerous treatment records from Dr. Cole where Mr. Workman was described as cooperative and appropriate (Tr. 437; *see* Tr. 385, 397, 717) and a June 2020 treatment note from Dr. Bundy indicating that Mr. Workman was doing "fairly well" and had appropriate affect (Tr. 437; *see* Tr. 419).

The ALJ even acknowledged Dr. Bundy's October 2019 treatment note where he noted that examination found Mr. Workman had problems connecting empathetically but also stated that

Mr. Workman was still cooperative. (Tr. 437; *see* Tr. 401.) Thus, the ALJ determined that it was "reasonable to limit him to occasional interaction with co-workers and supervisors, and limit him to no work where interaction with co-workers and supervisors, and limit him to no work where interaction with the public was an essential function of the job." (Tr. 437.) Finally, the ALJ again refers to the treatment notes at the end of her analysis of the opinions in the record to support of her RFC determination. (*See* Tr. 439.) The ALJ's repeated references to records demonstrating that Mr. Workman had cooperative behavior, appropriate mood and affect, and logical and coherent thought processes showed why the state agency consultants' opined limitation of superficial interaction with others was not supported by the objective medical evidence.

Though the ALJ did not use the word "supportability," the ALJ adequately considered that factor. *See, e.g.*, *Bruno*, 2021 WL 6494779, at *9 (An ALJ's explanation "need not be laid out like geometric proofs or a Dickens novel. It need only provide enough reasoning to allow the claimant (and a reviewing court) to understand the ALJ's thinking. Further, to assess the adequacy of the explanation, the court reads the ALJ's opinion as a whole and with common sense."). By discussing the objective medical evidence and explaining throughout the decision why the objective medical evidence did not warrant greater social interaction limitations, the ALJ built a logical bridge from the opinions and evidence to the ALJ's conclusion. *Fleischer*, 774. F. Supp. 2d at 877; *Heston*, 245 F.3d at 535.

To the extent that Mr. Workman disagrees with the ALJ's weighing of the evidence and cites specific pieces of evidence that would support the state agency opinions, that is an impermissible request to re-weigh the evidence. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (stating it is not the court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility"); *Hines v. Comm'r of Soc. Sec.*, No. 3:20-cv-620, 2021 WL

1895011, at *9 (N.D. Ohio Feb. 25, 2021) ("That [plaintiff] can point to other evidence in the record that might have supported [the medical] opinion is unavailing. This court does not review the record to determine whether evidence could have supported a different result, but whether evidence supported the ALJ's decision."), *report and recommendation adopted*, 2021 WL 1571659 (N.D. Ohio Apr. 22, 2021). Because Mr. Workman does not demonstrate that the ALJ's determinations were not supported by substantial evidence, the ALJ's evaluation of the medical opinions fell with this zone of choice. *Mullen*, 800 F.2d at 543. Accordingly, I recommend that the Court reject this assignment of error because it lacks merit.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated: April 26, 2024                                  */s Jennifer Dowdell Armstrong*
                                                       Jennifer Dowdell Armstrong
                                                       U.S. Magistrate Judge

## VII.   NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge,

making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).